United States District Court
Southern District of Texas
**ENTERED**
May 19, 2022
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| MILLSAP WATERPROOFING, INC., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:20-cv-00240 |
| | § | |
| UNITED STATES FIRE | § | |
| INSURANCE COMPANY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me are motions for summary judgment filed by Plaintiff Millsap Waterproofing, Inc. ("Millsap") and Defendant Amerisure Insurance Company ("Amerisure"). *See* Dkt. 19 and Dkt. 33. Having reviewed the briefing, the record, and the applicable law, I recommend the Court **GRANT** Millsap's motion to the extent it requests a finding that the claims brought against Millsap in the related state-court lawsuit involved more than one "occurrence," and **DENY** Amerisure's motion.

### I.    FACTUAL BACKGROUND

**A.    THE INCIDENT**

Over a decade ago, the Maravilla Condominiums, a multi-family condominium complex located in Galveston, Texas, suffered a series of unfortunate events. The complex, which consists of seven buildings (Buildings A, B, C, D, E, F, and G) with 164 units, was first damaged by Hurricane Ike in 2008. While repairing the damage caused by the hurricane, an unrelated fire broke out that damaged 77 units, primarily located in Buildings E, F, and G.

In 2010, the Maravilla Owners Association, Inc. ("Maravilla") hired several contractors, including Millsap, to repair the fire damage. Originally, Millsap's contract called for waterproofing around windows and door frames of Buildings E,

F, and G. However, four change orders followed, expanding Millsap's scope of work to include: (1) waterproofing the perimeter surfaces on the balconies and patios; (2) waterproofing the actual balconies and patios; (3) waterproofing the west side of Building G; and (4) pouring concrete over balconies and patios.

Multiple problems quickly arose with the various contractors' work. In 2016, Maravilla sued the contractors in Texas state court, alleging that their shoddy work damaged the condominium complex. More than 80 condominium owners eventually intervened. Relevant to the underlying motions, the state-court plaintiffs alleged that Millsap negligently performed work on windows, doorways, walkways, and balconies, resulting in extensive water damage to the condominium's common areas (e.g., walkways) and individual condominium units. Specifically, the state-court plaintiffs accused Millsaps of, among other things, failing to use the correct materials or installing the materials improperly and failing to ensure concrete was poured with sufficient sloping for drainage.

### B. THE INSURANCE POLICIES

Two insurance policies are relevant to the underlying motions:

- Amerisure issued Millsap a primary policy (the "Amerisure Policy"), with limits of $1 million per occurrence, subject to a $2 million aggregate limit.

- United States Fire Insurance Company ("US Fire") issued Millsap a commercial umbrella policy (the "US Fire Policy"), with limits of $11 million per occurrence (which was later reduced to $5 million per occurrence) in excess of the Amerisure Policy.

The Amerisure Policy is a standard commercial general liability policy and provides: "This insurance applies to 'bodily injury' and 'property damage' only if: (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory[.]'" Dkt. 19-20 at 91. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at 104. The US Fire Policy is a typical follow-form policy and contains the same definitions. *See* Dkt. 19-21 at 37, 46.

2

## C. THE INSURANCE DISPUTE

Millsap timely notified both insurers of the state-court lawsuit. Initially, Amerisure agreed to defend Millsap. When it became clear that the claims would not settle for less than $1 million, Amerisure argued that the state-court plaintiffs' damages arose from a single occurrence and refused to contribute more than $1 million to a potential settlement. Meanwhile, US Fire denied coverage because it determined that the damages stemmed from multiple occurrences and were, therefore, subject to Amerisure Policy's $2 million aggregate limit.

To limit its exposure at trial, Millsap accepted Amerisure's $1 million policy limits and tendered $550,000 of its own money toward a settlement, resolving the state-court plaintiffs' claims.

## II. PROCEDURAL HISTORY

In July 2020, Millsap filed this lawsuit against Amerisure and US Fire (collectively "Defendants"), bringing causes of action against both Defendants for breach of contract, breach of the common-law duty of good faith and fair dealing, and various violations of the Texas Insurance Code.[1]

In March 2021, Millsap filed a Motion for Partial Summary Judgment, in which it asks me to rule on a single threshold issue—whether Millsap's liability resulted from one or more occurrences. *See* Dkt. 19. Millsap does not advocate for a particular outcome, requesting only that I "[d]etermine the number of occurrences . . . so that the responsible insurer can pay what it owes." *Id.* at 3. In response, Amerisure, unsurprisingly, urges me to find that there was a single occurrence, meaning Millsap has exhausted the Amerisure Policy's $1 million per-occurrence limits. US Fire, on the other hand, contends that Millsap committed multiple liability-causing acts and, thus, Millsap's settlement did not exhaust the Amerisure Policy's $2 million aggregate limit.

---

[1] In September 2020, US Fire moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *See* Dkt. 40. I recommended the Court grant in part and deny in part that motion. *See* Dkt. 46. Specifically, I recommended the Court dismiss all claims against US Fire except for its alleged violation of Texas Insurance Code § 541.060(a)(7).

Separately, Amerisure filed its own Motion for Summary Judgment, in which it similarly asks me to decide that Millsap's negligent construction constitutes a single "occurrence" under the Amerisure Policy. *See* Dkt. 33. Because both motions seek a determination of the same question, I will decide them together.

### III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once satisfied, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial. *See id.* at 324. To do so, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015). The same standard applies to motions for partial summary judgment.

In ruling on a motion for summary judgment, I must construe "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). On cross-motions for summary judgment, I review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## IV. ANALYSIS

### A. TEXAS LAW ON THE NUMBER OF OCCURRENCES

The Amerisure Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Dkt. 19-20 at 104. Regardless of the number of claims made or suits brought, Amerisure agreed to pay no more than $1 million for "each occurrence." *Id.* at 100. *See id.* at 54. Although the parties disagree on the meaning of the term "occurrence," no party argues the Amerisure Policy is ambiguous.

In determining the number of occurrences, Texas courts apply "the 'cause' approach." *Evanston Ins. Co. v. Mid-Continent Cas. Co.*, 909 F.3d 143, 147 (5th Cir. 2018). Under this test, the proper focus is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects. *See id.* at 147–48. *See also Alley Theatre v. Hanover Ins. Co.*, 436 F. Supp. 3d 938, 949 (S.D. Tex. 2020) ("Under Texas law, when an occurrence under an insurance policy is defined to include a series of losses arising from the same event, the occurrence includes those losses proximately caused by that event."). Unfortunately, different courts have sometimes understood this standard to mean different things.

Any discussion of the "cause" approach typically begins with the Fifth Circuit's decision in *Maurice Pincoffs Co. v. Saint Paul Fire & Marine Insurance Co.*, 447 F.2d 204 (5th Cir. 1971). In that case, the insured, Maurice Pincoffs Co. ("Pincoffs"), unknowingly imported contaminated birdseed and then sold the seed to eight different dealers who, in turn, resold it to bird owners. Birds that ate the contaminated seed died, and their owners sued. Much like the Amerisure Policy, the *Pincoffs* policy defined "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 206. The Fifth Circuit held "that the 'occurrence' to which the policy must refer is the occurrence of the events or incidents for which Pincoffs is liable."

5

*Id.* Therefore, the court reasoned, the incidents that subjected Pincoffs to liability were the eight sales, meaning there had been eight "occurrences" under the policy. *See id.* at 207.

Although not binding on Texas state courts, *Pincoffs*'s "cause" approach became widely accepted following its endorsement by the Texas First Court of Appeals in 1983. *See Goose Creek Consol. I.S.D. v. Cont'l Cas. Co.*, 658 S.W.2d 338, 339 (Tex. App.—Houston [1st Dist.] 1983, no writ). *Accord State Farm Lloyds, Inc. v. Williams*, 960 S.W.2d 781, 784–85 (Tex. App.—Dallas 1997, pet. dism'd by agr.) ("We find the court's reasoning in *Maurice Pincoffs* instructive in the instant suit."). In *Goose Creek*, an arsonist set fire to two schools in the same school district. Although the same arsonist was the but-for cause of both fires, the fires occurred several blocks apart, and neither caused the other. *See* 658 S.W.2d at 339. Hoping to pay a single deductible, the school district argued that the fires should be treated as a single occurrence because both arose from the same "unbroken chain of events." *Id.* After citing to *Pincoffs*, the appellate court disagreed, concluding there were two occurrences because the "two fires [were] distinguishable in space and time and . . . one did not cause the other." *Id.* at 340–41.

*Pincoffs* and *Goose Creek* clarify that to determine the number of occurrences under a policy, courts must count the number of acts by the insured which give rise to liability. While helpful, this clarification is incomplete, as it "leaves unanswered the question of at what level of generality [courts] define the insured's actions." *Evanston*, 909 F.3d at 148. Thankfully, the Fifth Circuit provided further guidance in *H. E. Butt Grocery Co. v. National Union Fire Insurance Co.*, emphasizing unbroken causation. 150 F.3d 526 (5th Cir. 1998). "While a single occurrence may result in multiple injuries to multiple parties over a period of time," the Fifth Circuit explained, "if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken place." *Id.* at 534 (quotations omitted). In other

6

words, "unless the proximate cause for the injuries is continuous and unbroken, there must be more than one occurrence." *Evanston Ins. Co.*, 909 F.3d at 148.

The *HEB* court applied this rule to conclude that an HEB employee's sexual abuse of two different children one week apart at a single HEB store constituted two separate occurrences. *See HEB*, 150 F.3d at 535. In an effort to limit liability under its self-insurance, HEB had claimed there was only one occurrence because both incidents arose from its ongoing negligent supervision of the same employee. Rejecting this reasoning, the Fifth Circuit explained that Texas courts would not ignore the "immediate" cause of each child's injury in favor of the "underlying negligent supervision" when counting occurrences. *Id.* at 530. Because the two independent acts of sexual abuse and not the underlying negligent supervision "gave rise to HEB's separate and distinct liability" to each child, the Fifth Circuit held that two separate occurrences had taken place under the policy. *Id.* at 531.

One of the leading Texas cases on the single-occurrence topic is *Foust v. Ranger Insurance Co.*, 975 S.W.2d 329 (Tex. App.—San Antonio 1998, pet. denied). That case concerned a crop-dusting incident, where herbicide drifted onto neighboring tracts of land, damaging the neighbors' crops. *See id.* at 331. The neighbors and the pilot's insurer disputed how many occurrences had taken place under the policy, which defined "occurrence" to mean "a sudden event or repeated exposure to conditions involving the aircraft during the policy period." *Id.* at 333 (emphasis omitted). The policy also provided that all "bodily injury or property damage resulting from the same general conditions will be considered to be caused by one occurrence." *Id.* (emphasis omitted).

The neighbors insisted that a finding of a single occurrence was inappropriate, emphasizing that the plane landed several times to refuel over a three-hour period. *See id.* But the appellate court found those changes to be insignificant. *See id.* at 335. Focusing on the plain meaning of the policy language, the court concluded that the damage had been caused by "repeated exposure to the same general conditions—the drift of a herbicide which was being applied to crops

7

on adjoining property." *Id*. In other words, the crop-dusting process had damaged the neighboring tracts, and the fact that the "single procedure" required the plane to land intermittently or change altitude did not affect the continuous nature of the crop-dusting. *See id*. Because the *Foust* court considered all the injuries to have been caused by the same continuous negligence of the insured, there was only one occurrence under the policy.

The Fifth Circuit reaffirmed this principle in *Evanston*. There, the court considered whether there had been multiple occurrences where a runaway Mack truck caused a multi-vehicle accident. *See* 909 F.3d at 145–46. The policy provided that all bodily injuries and property damage "resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one 'accident.'" *Id*. at 145. After walking through the principles discussed above, the court held that "[t]he ongoing negligence of the runaway Mack truck was the single 'proximate, uninterrupted, and continuing cause' of all the collisions." *Id*. at 151. Observing that it was undisputed that the driver did not apply the breaks at any time from striking the first vehicle until it came to rest, the court explained: "Absent any indication that the driver regained control of the truck or that his negligence was otherwise interrupted between collisions (and we have no such indication), all of the collisions resulted from the same continuous condition—the unbroken negligence of the Mack truck driver. There was therefore one 'accident' under the policy." *Id*.

In sum, the appropriate inquiry is whether there was one proximate, uninterrupted, and continuing cause which resulted in all the injuries and damage. If so, then there was a single occurrence. If the chain of proximate causation was broken by a pause in the negligent conduct or by some intervening cause, then there were multiple occurrences, even if the insured's negligent conduct which caused each of the injuries was the same kind of negligent conduct.

8

### B.   THE CLAIMS AT ISSUE ARISE OUT OF MULTIPLE OCCURRENCES

#### *1. The Injury-Causing Events Are Distinguishable in Space and Time and Did Not Cause One Another*

Amerisure argues Millsap's negligent workmanship "makes up the single 'proximate, uninterrupted, and continuing cause' for damages sought against it." Dkt. 23 at 14. That is, it is Amerisure's position that although "[Millsap] may have performed multiple types of work, performed multiple negligent acts, and performed the work in phases, there is no indication there was ever a pause in [Millsap's] negligent performance." *Id.* at 4. Thus, "[a]ny differences between [Millsap's] allegedly negligent acts or the timing of those acts are merely incidental." *Id.*

The Fifth Circuit's decision in *U.E. Texas One-Barrington, Ltd. v. General Star Indemnity Co.*, 332 F.3d 274 (5th Cir. 2003), provides a helpful roadmap. *U.E. Texas* involved a large apartment complex consisting of multiple residential buildings. Moisture changes in the soil caused foundation movement, which in turn caused plumbing leaks. *See id.* at 276. The parties disputed the cause of the moisture change but agreed that leaks under any particular building's foundation only affected the foundation of that building and did not contribute to the movement of any other building foundation, nor did they cause any of the other plumbing leaks.

The property owner argued that because the leaks could all be "traced back to defects in the materials and installation of the underground plumbing system," there was only one "occurrence" under the policy. *Id.* at 277. The Fifth Circuit rejected this argument. Citing to *Goose Creek*, the court wrote that it was "not to look to any overarching cause, but rather to focus on the event that gave rise to . . . liability under the policy." *Id.* at 278. While the court generally agreed that "had the plumbing system never been installed the leaks would not have occurred," it found that tracing the damages back to the pipes' installation was a bridge too far. *See id.* at 278. Rather, because the losses arose when the pipes broke, not when

9

they were installed, the court concluded that the multiple leaks were distinguishable in space and time and constituted separate occurrences. *See id.*

Importantly, the *U.E. Texas* majority rejected the argument that courts are to apply a different "liability triggering test" under policies designed to protect the insured from liability to others (i.e., liability policies) as opposed to the "cause" test when faced with policies designed to protect the insured from damage or loss to property owned by the insured (i.e., loss policies). *See id.* at 277 n.2.

Amerisure's single-occurrence argument overlooks Millsap's various acts of faulty workmanship. The damages caused by Millsap are not the result of a single, uninterrupted, continuing cause, but from different types of work on multiple areas of separate buildings. Millsap's work on the Maravilla project occurred over a 10-month period and caused damages to both the individual condominium units and common elements of the condominium complex.[2]

Yes, broadly speaking, Millsap's workmanship is the root cause of the damages at issue. But to cursorily attribute the complained-of damages to Millsap's general workmanship would be akin to tracing the damages caused by the various leaks in *U.E. Texas* to the plumbing system's installation. *See U.E. Tex.*, 332 F.3d at 278 ("Of course it is true that had the plumbing system never been installed the leaks would not have occurred. In this sense, it is true that the leaks which independently damaged the nineteen buildings arose from the same event."). It cannot be said that the complained-of damages were the result of the "continuous or repeated exposure to substantially the same general harmful conditions." Dkt. 19-12 at 104 (defining "occurrence" in the Amerisure Policy). Nor can it be said that Millsap's work was a continuous and unbroken force that, once set in motion,

---

[2] Initially, Millsap's scope of work concerned waterproofing the renovated condominium units' windows and door frames. Four changes orders followed, expanding Millsap's scope of work to waterproofing: (1) balcony and patio perimeter surfaces; (2) the actual balconies and patios; and (3) part of the west side of Building G. The final change order had Millsap pour the concrete on top of the waterproofing membrane on terrace decks and balconies, the result of which was uneven and "allowed water to pond and not drain properly." Dkt. 19-17 at 15. The state-court plaintiffs alleged that Millsap's work was defective in each of these areas.

caused multiple injuries. *See Evanston*, 909 F.3d at 148 ("unless the proximate cause for the injuries is continuous and unbroken, there must be more than one occurrence").

Millsap performed work on multiple, distinct phases of the project. Although Millsap's work on the various phases did, at times, involve the same condominium units or common areas, its negligent workmanship during any phase, standing alone, was a separate occurrence-causing force giving rise to liability to one or more state-court plaintiffs. For example, each condominium unit has a concrete deck. Some condominium owners who intervened in the state-court lawsuit complained that their concrete decks were not properly sloped, which permitted water from those decks to drain toward and into the interior of their units. But Millsap's failure to properly slope the concrete decks is unrelated to its other negligent waterproofing work, which necessarily caused the complained-of water damage for condominium owners whose concrete decks were properly sloped.[3]

In support of its single-occurrence theory, Amerisure relies heavily on a recent decision from the Western District of Texas, *Travelers Casualty Insurance Company of America v. Mediterranean Grill & Kabob Inc.*, 499 F. Supp. 3d 371 (W.D. Tex. 2020). In that case, a restaurant's contaminated food caused 124 cases of salmonella poisoning over a four-day period. The defendant-restaurant argued that each incident of food poisoning was a separate "occurrence." The district court disagreed, finding: "[U]nder Texas's 'cause' analysis . . . there was a single, continuous event that both allegedly caused the injuries . . . and gave rise to [the

---

[3] The state-court plaintiffs' petitions in intervention pled as follows: "The problems include but are not limited to balconies with negative slopes causing water to be trapped and leak[ed] into the buildings . . . . Specifically, the structural framing in the units has been damaged by moisture intrusion, which is ongoing. The transition between the walls and the concrete deck were improperly designed and/or improperly constructed. This caused water to enter the wall cavities. The decks themselves are improperly sloped. In some cases, the concrete balconies have cracked, potentially providing another point of entry." Dkt. 22-1 at 15–16, 47, 61 (internal citations omitted). *See also* Dkt. 19-17 at 14–16 (describing seven separate ways in which "Millsap improperly and incorrectly performed its scope of work," the seventh of which is Millsap's failure to properly slope concrete decks and walkways).

plaintiff's] liability. Therefore, the food poisonings were a single 'occurrence' under the policy." *Id.* at 374–75.

Amerisure emphasizes that the *Travelers* court, when distinguishing its decision from *Goose Creek* and *HEB*, observed that the defendant was unable to point to an intervening tort or independent act of negligence "which interrupted the proximate and continuing cause of the Claimants' injuries, i.e., the salmonella contamination." *Id.* at 376. Attempting to draw an analogy between *Travelers* and Millsap's work on the Maravilla project, Amerisure argues that "there is no indication that [Millsap] ever ceased its negligent performance . . ., performed in a workmanlike manner, and then began performing negligently again." Dkt. 23 at 15–16. In other words, Millsap's workmanship was negligent from the get-go; therefore, its consistent and uninterrupted poor performance remained the proximate, uninterrupted, and continuing cause of the complained-of damages.

Amerisure's argument misses the mark. In *Travelers*, the defendant's liability arose from its preparation of a contaminated product, which it then sold to its customers. *See id.* at 378. Thus, the customers' injuries were caused by a continuous or repeated exposure to a single, proximate cause—the defendant's contaminated food. *See Evanston*, 909 F.3d at 151 ("all of the collisions resulted from the same continuous condition—the unbroken negligence of the Mack truck driver"). In contrast, no one negligent act or omission by Millsap was the sole and proximate cause of the resulting damages. Rather, the damages at issue resulted from Millsap performing different types of work on multiple areas of separate buildings.

My conclusion is supported by the Fourteenth District Court of Appeals decision in *Lennar Corp. v. Great American Insurance Co.*, 200 S.W.3d 651 (Tex. App.—Houston [14th Dist.] 2006, pet. denied), *abrogated by Gilbert Texas Construction L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010).

In *Lennar*, an insured homebuilder, Lennar,[4] built over 400 houses in the Houston area with a defective synthetic stucco that trapped water behind it, causing, among other problems, wood rot, mold, and termite infestation. *See id.* at 661. Lennar sought coverage under several commercial general liability policies. *See id.* at 660. One of Lennar's primary insurers argued that the damage to each home constituted a separate occurrence.[5] *See id.* at 681. Applying the "cause" test, the *Lennar* court reasoned that the application of defective stucco caused damage only to the particular home to which it was applied; thus, the damage to each home constituted a separate occurrence under the policy. *See id.* at 682–83.

Similarly, here, damages incurred by one state-court plaintiff were not caused by nor did they cause damages to another state-court plaintiff. *See id.* at 683 ("[T]he [stucco's] entrapment of water on a particular home caused the damage to that home only. Therefore, Lennar was exposed to a new and separate liability for each home on which [the stucco] was applied."); *Goose Creek*, 658 S.W.2d at 341 (finding multiple occurrences because the "two fires [were] distinguishable in space and time" and "one did not cause the other").

### 2. It Is Irrelevant That Millsap Performed Work Under a Single Contract

Amerisure also argues that Millsap's "defective construction of the Project involved only one 'occurrence' because [Millsap's] single contract with [Maravilla] gave rise to [Millsap's] liability." Dkt. 23 at 4. In support of its single-contract theory, Amerisure attempts to distinguish *Lennar*, arguing that the appellate court's finding of multiple occurrences "was directly tied to the builder's act of individually selling each home, thereby incurring liability to each homeowner." Dkt. 33 at 12. *See id.* ("Each contract with each new homeowner created new

---

[4] Lennar Corporation, Lennar Homes of Texas Land and Construction, Ltd., and Lennar Homes of Texas Sales and Marketing, Ltd., d/b/a Village Builders.

[5] The policy at issue had a self-insured retention of $250,000 per occurrence, meaning Lennar was required to satisfy a $250,000 deductible per occurrence before coverage was triggered. *See Lennar*, 200 S.W.3d at 681. The multiple-occurrence issue was particularly important because no individual claim exceeded $250,000.

13

potential liability from the defective construction and, therefore, a new 'occurrence.'"). In contrast, Amerisure argues, Millsap's contract with Maravilla "created a single source of liability." *Id*. I do not find this argument persuasive. In fact, United States Magistrate Judge Christina Bryan recently rejected a near-identical argument. *See Urb. Oaks Builders LLC v. Gemini Ins. Co.*, No. 4:19-CV-4211, 2021 WL 7209213, at *5 (S.D. Tex. Dec. 14, 2021).

In *Urban Oaks*, a general contractor, Urban Oaks Builders, LLC ("UOB"), was sued by the purchaser of a six-building apartment complex. *See id*. at *1. UOB sought coverage from its insurer, Gemini Insurance Company ("Gemini"). When Gemini refused, UOB sued Gemini in federal court, seeking, among other things, a declaration that Gemini had a duty to defend UOB from claims brought against it by the purchaser. In deciding the duty-to-defend issue, Judge Bryan, relying on *Lennar*, found that, although UOB's alleged liability stemmed from the purchase agreement, allegations of multiple construction defects caused by various subcontractors to the six apartment buildings constituted multiple occurrences.[6] *See id*. at *5 ("the damages alleged . . . do not result from a single, uninterrupted, continuing cause, but from multiple types of work, by multiple subcontractors, on multiple areas of multiple buildings").

Further informing my decision is an analogous case out of the Southern District of Florida, *Mid-Content Casualty Co. v. Basdeo*, 742 F. Supp. 2d 1293 (S.D. Fla. 2010), *aff'd* 477 F. App'x 702 (11th Cir. 2012). Like Texas, Florida uses a "cause" test to determine whether a claim represents a single occurrence or multiple occurrences. *See Koikos v. Travelers Ins. Co.*, 849 So.2d 263, 269–72 (Fla. 2003).

*Basdeo* involved a condominium restoration project where the insured's negligent workmanship resulted in extensive water damage. The insurer sought to

---

[6] It is worth noting that, like Amerisure, Gemini also attempted to distinguish *Lennar*'s holding by arguing that the source of UOB's alleged liability was its "faulty construction at a single project that [was] then sold in a single contract." Cause No. 4:19-cv-04211, Docket Entry 260 at 5. *See id*. at 11 (describing the liability-triggering event in *Lennar* as the individual sale of over 400 homes).

14

limit its liability, arguing that a single occurrence caused the complained-of water damage because the insured, First State Development Corporation ("First State"), performed its construction pursuant to a single contract. 742 F. Supp. 2d at 1345. The district court disagreed, concluding that three occurrences transpired: (1) damages caused in connection with First State's tarping work; (2) damages caused in connection with First State's work on the roofs; and (3) damages caused in connection with First State's work on the mansards.[7] *See id.* at 1347.

Although each category of damages exposed the building's interior to the elements and contributed to the complained-of water damage, the district court rejected the insurer's single-contract theory, finding instead that each category was caused by "a separate force, distinguishable in time and space." *Id.* at 1348. Notably, the district court found it particularly relevant that First State "undertook different types of work on different parts of the buildings," concluding that its "work on each of these parts of the buildings set in motion" a separate occurrence-causing force. *Id.* at 1348. Similarly, here, while Millsap may be the common denominator, there is no evidence that its work during an earlier phase of the project caused or added to damage incurred in subsequent phases. Rather, its work on the various phases of the Maravilla project set in motion separate occurrence-causing forces.

The law is clear: I am to look at the number of different events that caused the complained-of damages, not whether Millsap's "liability in the [state-court lawsuit] arose from the execution of one construction contract." Dkt. 33 at 2. *See HEB*, 150 F.3d at 530 ("Texas courts agree that the proper focus in interpreting 'occurrence' is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects." (collecting cases)). Thus, I must focus on the cause of the damages—namely, whether the damages were the result of a single proximate, uninterrupted, and continuing cause.

---

[7] A "mansard" refers to "a roof having two slopes on all sides with the lower slope steeper than the upper one." *Mansard*, MERRIAM-WEBSTER ONLINE (2022).

15

Here, there is no one proximate, uninterrupted, and continuing cause that resulted in all the damages for which Millsap is responsible. Each phase of Millsap's work on the project was performed separately and distinguishable in time. *See Evanston*, 909 F.3d at 148 ("unless the proximate cause for the injuries is continuous and unbroken, there must be more than one occurrence"). While it can be generally argued that Millsap's "work was consistently negligent," Dkt. 33 at 2, it cannot be said that "[a]ny differences between [Millsap's] allegedly negligent acts or the timing of those acts are merely incidental" to the damages at issue. Dkt. 23 at 4. Unlike the crop duster in *Foust*, where the process of applying the herbicide damaged the neighboring tracts of land, there was not one single negligent act or omission by Millsap that was the sole and proximate cause of the resulting damages. *See Foust*, 909 F.3d at 335 ("The herbicide was applied one time, in a process that required several passes over various tracts of land. The application process constituted a single procedure, and it is this procedure as a whole that caused the damage."); *Evanston*, 909 F.3d at 151 ("The ongoing negligence of the runaway Mack truck was the single 'proximate, uninterrupted, and continuing cause' of all the collisions."). Rather, as explained, Millsap's negligent workmanship during any phase, standing alone, was a separate occurrence-causing force giving rise to liability to one or more state-court plaintiffs.

## CONCLUSION

For the above reasons, I recommend that the Court **GRANT** Millsap's Motion for Partial Summary Judgment (Dkt. 19) to the extent it requests a finding that the claims brought against Millsap in a state-court lawsuit involved more than one "occurrence," and **DENY** Amerisure's Motion for Summary Judgment (Dkt. 33).

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from the receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13.

Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

Signed on this 19th day of May 2022.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE